Potts *v.* Brotherton.

4-5328                                                    124 S. W. 2d 5

Opinion delivered January 23, 1939.

*Eugene W. Moore* and *M. A. Hathcoat,* for appellant.
*W. S. Walker* and *John H. Shouse,* for appellee.

SMITH, J. W. H. Young owned at the time of his death in 1936 a farm consisting of 552 acres. He had executed a note to C. C. Harris in the sum of $552, which at the time of his death was owned by E. B. Brotherton. Charles Rowland qualified as administrator of Young's estate, and this suit was brought against him in that capacity on the note. The widow and heirs at law of Young were made parties, and as to them it was prayed that certain deeds executed by Young to his wife and their children be declared void as having been executed to defraud Young's creditors. The relief prayed was granted, and from that decree is this appeal.

The statute of non-claim was pleaded, it being alleged and insisted that the note was not presented to the administrator in the time and manner provided by law. Attached to the complaint, as an exhibit thereto, was a copy of the note with the statutory affidavit of Brotherton attached thereto, but no affidavit of the assignor, C. C. Harris, was attached.

Testimony was offered to the effect that Brotherton filed, on October 27, 1936, a petition in the probate court of Boone county, wherein testator resided, praying the appointment of an administrator of the estate of Young, and Brotherton at the same time verified his demand as required by law. For some reason letters of administration were not actually issued until December 1, 1936. The affidavit of Harris, the assignor, was also exhibited to the administrator. The administrator, in his answer, admitted that the note, duly verified by both the assignor and assignee, as required by § 104, Pope's Digest, had been presented to him, and his attorney made the admission in open court upon the trial of the cause that this had been done before the commencement of this suit in January, 1937. There is no testimony in the record to show that the fact thus admitted was untrue. The court was, therefore, fully warranted in finding that the statute of non-claim did not apply.

The decree of the court below adjudged that the deeds from Young and wife to their children were void, not only as to the creditors of Young, but for all or any purposes. We think the decree was too broad in this re-

spect, in any event, and that the court should have set the deeds aside only for the purpose of paying intestate's debts, and there appears to be now no debt except the note due Brotherton. The value of the land so greatly exceeds the judgment, which was for $1,190.85, that the heirs may prefer to pay this judgment and preserve the partition of their father's estate which he made by deeds to his children. The decree will be modified in this respect to permit them to do so, if they wish.

It is earnestly insisted, however, that it was error to set the deeds aside for any purpose, for the reason that Young was solvent both before and after the execution of the conveyances to his children, and that they paid the fair value of the lands, and this contention presents the serious and real question in the case.

It appears that on June 10, 1931, Young and his wife executed their two notes to the Citizens Bank & Trust Company and the Citizens Investment Company for $2,285.95 and $1,428.86, respectively, to secure the payment of which they executed a real estate mortgage on the 552 acres of land owned by Young and a chattel mortgage on 87 head of cattle which he also owned.

Soon after the execution of these notes and mortgages, a family conference was held in which it was decided that Young should divide his lands and convey them to his children, and that the children should thereafter support him and his wife. Young was then about 75 years old. Before executing these deeds Young filed a suit to cancel the mortgages which he had given. This suit was compromised by the payment of the sum of $2,100 to the holders of the notes. The money with which this payment was made appears to have been derived from the sale of cattle which Young owned. The testimony is uncertain as to the number of cattle not sold and as to their disposition.

The administrator had no assets in his hands with which to pay the note here sued on, and this suit was filed December 24, 1936, to cancel the deeds of conveyance made by Young to his children. In the answer filed by them they alleged the solvency of their father at the time of the execution of the deeds, and that they had

paid full value for the lands by assuming the obligation to pay the mortgage on them, and by agreeing to take care of their parents.

It is insisted—and we think properly so—that, in determining the value of the land conveyed to the children, the value should be determined as of the date of those deeds, and that the value of the homestead should be taken into account. It was said, in the case of *First State Bank* v. *Gilchrist*, 190 Ark. 356, 79 S. W. 2d 281, that, in determining the adequacy of the consideration of a deed alleged to be fraudulent, whereof a part was the debtor's homestead, that part must be deducted from the total area. But, even so, it was not shown that the average value of the homestead was greater than the average value per acre of the remainder of the land.

There were 552 acres of the land, and no one placed its value at the time the deeds were made at less than $10 per acre. Now, there was a debt for the amounts above stated which was secured by mortgages on both the land and the cattle, but the children paid but little to discharge these mortgages, although they assumed their payment. It was paid by the sale of cattle which Young himself owned. No one attempted to account for the cattle not sold, although it was shown that none of them were ever delivered to the administrator, and they never became assets to pay the intestate's debts.

It appears, therefore, that the children received lands worth not less than $5,520.00, and probably much more, for which they paid nothing except the value of the services rendered their father, including expenses of his last illness. Certain of the children claim to have made advances which were used in the discharge of the mortgage debt, but they do not account for the cattle which were of a greater value than the sum paid in satisfaction of the mortgages. A son-in-law who lived in Missouri testified that he loaned and advanced to the heirs the sum of $1,348.50, but he made no attempt to show how much of this was used in paying the mortgages. His wife, one of the heirs, testified that she agreed that she would advance $350, and thus discharge her proportionate share of the mortgages. It is fairly

inferable that the children got the cattle which were not sold to pay the mortgages, and it is certain that the cattle were never delivered to the administrator.

The testimony shows various attentions to Young by his children, although he was never taken into the home of any one of them. He was bedfast during the last three months of his life, during which time two of his children attended him. A doctor who attended Young estimated the value of those services at $2.50 per day for each attendant, and his own bill was only $230. Other doctors appear to have attended Young, but the amount of their bills was not shown.

After allowing credit for all expenditures claimed to have been paid by way of payment for the lands or in consideration of their conveyance, too great a difference exists between payments made and the value of the land conveyed to overturn the chancellor's finding that fair value was not paid, and we find the fact to be that the value of all credits which may be treated as a part of the consideration for the deeds bears no fair relation to the value of the property conveyed.

Even though it were conceded that Young was solvent when he made the deeds, there can be no doubt that these conveyances rendered him insolvent, and, this being true, the chancellor's finding that the deeds were made in fraud of creditors must be upheld.

It does not appear that any of the children paid Young himself any sum of money which was used by him in discharging the mortgages against his real estate and personal property; but this would not have been of controlling importance had they done so.

In the case of *Simon* v. *Reynolds-Davis Grocery Co.,* 108 Ark. 164, 156 S. W. 1015, Simon, an embarrassed debtor, sold all his lands, except his homestead, to his sons for an amount considerably less than the value of the lands conveyed. In holding that this was a strong badge of fraud, the court said: "It matters not that Phil Simon used the whole or a part of the proceeds of the sale, in payment on his debts, for he was unable to pay his debts and was insolvent, and the fact that the conveyance was made to his sons under such circum-

stances would warrant the conclusion that he was making the conveyance in order to put the property in the hands of his children, and to give them the benefit of the difference between the price paid by them and the real value of the land." Continuing it was there said: "This court has often held that 'conveyances made to members of the household and near relatives of any embarrassed debtor are looked upon with suspicion and scrutinized with care, and when they are voluntary, they are *prima facie* fraudulent, and when the embarrassment of the debtor proceeds to financial wreck, they are presumed conclusively to be fraudulent as to existing creditors.' [Citing cases.] To the extent that the price paid was less than the value of the land, the conveyance, so far as creditors are concerned, must be held to be voluntary and without consideration."

Here, if all credits were allowed which the heirs have any reasonable right to claim as the price paid by them for the land, the total amount thereof is far less than the value of the land, the difference being much more than the sum for which judgment was rendered against the estate. To this extent, at least, as was said in the Simon case, supra, the conveyance must be held to be voluntary and without consideration.

The court below found there were no assets in the hands of the administrator with which to pay the indebtedness adjudged to be due, and that it was necessary to sell the real estate of the deceased to pay the judgment rendered. It was ordered, however, that the widow might claim her right of homestead (and this she may, of course, do), and that the remainder be sold if the judgment be not paid.

The decree of the court below will be modified, in the particular herein indicated, and will be remanded for that purpose.